FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ MAR 31 2014 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
L.M. AND A.M., INDIVIDUALLY AND
AS PARENTS OF THEIR DISABLED
MINOR CHILD, A.M.,

             Plaintiffs,

   -against-

THE EAST MEADOW SCHOOL
DISTRICT,

            Defendant.
------------------------------------------------X

MEMORANDUM AND ORDER

CV 12-3729

(Wexler, J.)

APPEARANCES:

   THE LAW OFFICES OF GEORGE ZELMA
   GEORGE PETER ZELMA, ESQ.
   28 West 44th Street, Suite 711
   New York, New York 10036
   Attorneys for Plaintiffs

   JASPAN SCHLESINGER LLP
   BY: CAROLE A. MELNICK, ESQ.
        STANLEY A. CAMHI, ESQ.
   300 Garden City Plaza
   Garden City, New York 11530
   Attorneys for Defendants

WEXLER, District Judge

      This case involves the education plan provided by the defendant East Meadow School District ("East Meadow," "School District" or "Defendant") to the disabled son, A.M., of the Plaintiffs L.M. and A.M. ("Plaintiffs" or "Parents") for the school year 2011-2012. Claiming that the District's plan was not "appropriate" for A.M., Plaintiffs seek reimbursement of the tuition expenses to send A.M. to a private school for that school year.

Plaintiffs bring this action pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §1400, *et seq.* They seek review and reversal of the decision of the New York State Education Department's State Review Officer ("SRO") (affirming the decision of an Impartial Hearing Officer ("IHO")) that the education plan provided by the East Meadow School District for the 2011-2012 school year was "appropriate" for A.M.'s needs, thus precluding Plaintiff's claim for tuition reimbursement. Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, the Court denies Plaintiffs' motion and grants summary judgment to the Defendant.

## BACKGROUND

I. Factual Background

The facts set forth below are taken from the materials submitted to the Court, namely, the certified copy of the administrative record, including the transcript and exhibits of the impartial hearing, and the parties' Local Rule 56.1 Statements.

Plaintiffs L.M. and A.M. are the parents of A.M., a child who resides in the Defendant East Meadow School District. A.M., who was five years old in the 2010-2011 school year, has been diagnosed with PDD NOS, an Autism Spectrum Disorder, and is classified as a child with a disability within the meaing of the IDEA. He has major developmental delays and deficits in chewing, eating, social attention, speech and language, and motor skills, which interfere with his participation in age-appropriate activities and learning. Defendant's Local Rule 56.1 Statement ("Def. 56.1 Stmt.", ¶¶ 1-3; Plaintiffs' Local Rule 56.1 Statement ("Pl. 56.1 Stmt."), ¶¶ 1-2, 5, 7.

Once a child is classified as having a disability, the District is required by the

IDEA and New York law to provide him or her with a "free appropriate public education" ("FAPE") within the "least restrictive environment" ("LRE"). Def. 56.1 Stmt., ¶ 3-4.

A. The 2010-2011 School Year

On August 10, 2010, as A.M.'s transition to a school-age program for the 2010-2011 school year approached,[1] the District's Committee on Special Education ("CSE"), including A.M.'s parents, met to develop an Individual Education Plan ("IEP") for A.M. for the upcoming school year. The IEP that was generated from that meeting recommended that A.M. attend the Board of Cooperative Education Services, Children's Readiness Center ("BOCES-CRC"). He was recommended for a class with a 6:1+2 student/teacher ratio, meaning six students, one special education teacher with expertise in educating students with autism, and two teaching assistants. The IEP also provided for A.M. to receive the following related services: a 1:1 individual aide, feeding therapy, occupational therapy, physical; therapy, speech/language therapy and parent training for A.M.'s parents. Def. 56.1 Stmt., ¶ 8-9; Plaintiffs' Counter-Local Rule 56.1 Statement ("Pl. Counter-56.1 Stmt."), ¶ 8-9. The CSE also recommended that A.M. receive feeding therapy at home. Pl. 56.1 Stmt, ¶ 12; Defendant's Counter-Local Rule 56.1 Statement ("Def. Counter-56.1 Stmt."), ¶ 12. There were also 18 annual goals and 35 corresponding short-term objectives on the IEP to address A.M.'s needs in reading, mathematics, speech/language skills, social/emotional/behavioral skills, motor skills, and

---

[1] A.M. was classified in his pre-school years and received services in the Districts in which he resided at those relevant times. Those plans are not at issue in this case.

basic cognitive/daily living skills Defendant's Exhibit[2] 15 ("Def. Ex."): 2010-2011 IEP, at 7-13. A.M.'s parents accepted the CSE's recommendation that A.M. be placed at BOCES-CRC. Pl. 56.1 Stmt, ¶ 12; Def. Counter-56.1 Stmt, ¶ 12. A.M. began attending BOCES-CRC on September 8, 2010. Def. 56.1 Stmt., ¶ 10; Pl. Counter-56.1 Stmt., ¶ 10.

1. October 2010 - Feeding Intervention Plan

Once the school year was underway, the Parents grew concerned about A.M.'s feeding problem, and by letter dated October 13, 2010, they requested a CSE meeting to discuss A.M.'s feeding and to request "another feeding evaluation." Def. Ex. 22. A Feeding Intervention Plan was created on October 14, 2010. Def. Ex. 23; Pl. Ex. P. The plan was to provide A.M. two feeding sessions a day for 15 minutes each, with food presented for a fixed 30 second interval. Id. The target was to achieve "food acceptance" of an entire spoon of food in the mouth within 5 seconds of presentation, have the food swallowed, and to eliminate "inappropriate behavior," such as batting the spoon, and "negative vocalization," such as crying. Reinforcers were to be used, and data on A.M.'s progress would be collected on a daily basis. Id.

During the hearing before the IHO, A.M.'s classroom teacher testified that from the beginning of the school year, A.M.'s mother expressed her desire that A.M. eat all of the food that was sent in with him for lunch. On one occasion, the mother came to school and demonstrated how A.M. was fed, and the teacher testified that A.M. was "crying and protesting," and that A.M. was "forced to eat the food." (Transcript, at 302-303). The teacher stated the school was not in a position to forcibly feed him and run the risk of

---

[2]The exhibits reference here are those that were introduced at the impartial hearing and are contained in the administrative record before the Court.

him choking (id.), and that the school "wanted him to make the choice to eat." Id. The teacher noted that A.M. would swallow the food without chewing it. Id., at 304. The goal was to work with him to become more comfortable with his lunch, with less protest, then work on the chewing. Id., at 305. Around this time, A.M.'s mother would often come to school at lunch time and remove him from the building to feed him.[3] She was not permitted to feed him in school. Id., 305-307.

On October 22, 2010, unsatisfied with the revised plan, Plaintiffs sent the District a letter expressing their disagreement with the BOCES-CRC staff as to how A.M.'s feeding problem was being handled, and that they did not feel BOCES was an appropriate placement for A.M. Def. Ex. 27. Plaintiffs also requested that they take the student out of school "everyday" at noon and arrange for an agency to provide home-based services. Def. Ex. 27 at 1-2.

2. October 29, 2010 CSE Meeting

A meeting of the CSE was convened on October 29, 2010 to discuss the Parent's dissatisfaction with the feeding plan and to discuss them not being allowed to feed A.M. in the building, or come into A.M.'s classroom without an appointment. Def. Ex. 29: IEP of Oct. 29, 2010 meeting. The IEP notes that "A.M.'s rate of food consumption has declined since making the transition to the school age program at BOCES-CRC," and that the parents were picking him up early to feed him his lunch. The parents were encouraged to "be patient with the feeding plan developed by CRC," and to feed him

---

[3]There is evidence in the record that A.M.'s mother would remove him from the building and feed him in the car. This evolved to the point where the mother would remove him from school around 12 noon to feed him and A.M. would not return to school on a regular basis.

later in the morning and keep him in school as long as possible before coming to pick him up, to help A.M. make progress on his educational goals. The Parents agreed to do this.[4] Also, the IEP notes the staff opinion that the feeding issues were largely behavioral, and that the District was seeking a feeding therapist to help A.M. at home after the school day. Finally, it notes that while the District believes BOCES-CRC is the appropriate placement, in light of the Parent's dissatisfaction, it would make applications for A.M.'s placement in other programs and keep the Parents informed. Def. Ex. 29, at 3-4. The 18 goals and 35 short-term objectives of the earlier IEP remained the same and continued. Def. Ex. 29, at 8-13.

### 3. December CSE Meeting

Plaintiffs' dissatisfaction continued. On December 2, 2010, they wrote to the District that BOCES-CRC was not an appropriate placement since it was unable to meet their son's learning, sensory and behavioral disabilities, and need for feeding therapy. They wrote that having exhausted all alternatives offered, they had no alternative but to place him in a private school (the Elijah School) for the remainder of the year, and would be seeking tuition and transportation reimbursement. Def. Ex. 36. The Parents wrote again on December 9, 2010 that there was no available placement for A.M. at the Elijah School for the remainder of the school year. Def. Ex. 37.

On December 16, 2010, another CSE meeting was held to discuss A.M.'s placement and for a program review. Def. Ex. 38: IEP from Dec. 16, 2010 meeting.

---

[4]Following the meeting, the Parents sent a letter noting their agreement to keep A.M. at school until 3 p.m, with the understanding that the school would incorporate a third feeding into the school day. See Def. Ex. 28.

This IEP notes the parents' frustration with A.M.'s progress with the feeding program, noting that while his food consumption has increased since the Feeding Intervention Plan was implemented, there is concern he is not eating enough during the day, and is irritable when he returns home from school. Def. Ex. 38, at 2. As for his other needs noted on the IEP, the BOCES-CRC staff reported that A.M. was making progress on many of his goals, including improved eye contact and attention, using a picture exchange communication system ("PECS") to request certain items, doing well with toilet training, working on gross motor imitation and making progress on "independent task completion," retrieving and using "classroom materials independently and appropriately," and making progress on his matching goal. A.M. was learning to walk "independently in the hallways." Regarding his feeding, it was reported that he was up to taking three bites consistently before refusing. Def. Ex. 38, at 2-3.

Also at that meeting the Parents declined the District's offer for A.M.'s placement at the Developmental Disabilities Institute in Huntington because of the distance from their home. Id. The other goals on the earlier IEP remained the same, with an added goal of having A.M. use accurate bite and chew patterns on various food textures. Def. Ex. 38, at 7-13.

In a letter dated May 4, 2011, A.M.'s parents informed the District of their intention to remove A.M. from the BOCES program and place him in the Gersh Academy, a private school for children with autism spectrum disorders in Glen Oaks, Queens. The Parents also advised the District they would be seeking tuition and transportation reimbursement under the I.D.E.A. Def. Ex. 62.

B. <u>The 2011-2012 School Year</u>

An annual review meeting of the CSE, including A.M.'s parents, was held on May 26, 2011 for the purpose of reviewing the 2010-2011 IEP and to create a new one for the 2011-2012 school year. Def. Ex. 69; Pl. Ex. U: IEP of May 26, 2010 meeting. Lawyers for the Parents and the District were also present.

The BOCES-CRC team reported that A.M. had made progress on many of his goals. The IEP states that A.M. was following class routines, increasing time he could attend to a task, was able to maintain eye contact, follow simple directives, retrieve and utilize classroom materials, and walk more independently in the hallway. He was timed trained for toileting. He was verbalizing some words, but inconsistently and not necessarily functionally, and making progress imitating sounds, and able to gesture yes or no when prompted. Pl. Ex. U, at 3.

In physical therapy, he met with success and developed his gross motor abilities to the point that it was recommended those services be discontinued. He was reported to be making success in occupational therapy and developing his weak fine motor skills. In the classroom, he was matching objects, colors and pictures and completing interlocking picture puzzles. <u>Id.</u>

A.M.'s progress in feeding was demonstrated by his ability to independently put the spoon in his mouth independently with 88% success, and no longer crying or whining or otherwise avoiding feeding sessions. It was reported that he appeared comfortable during mealtime, the pace of his feeding had increased, and his food consumption had increased to 10 ounces of pasta sent from home. After eating, he was joined at the table with his classmates, while he would eat a snack, usually of berries that he ate

independently, sitting appropriately with his peers. His chewing ability remained a significant weakness, although improved chewing was "emerging." Id. The IEP also notes that make-up home feeding therapy sessions were owed A.M. in light of the District's difficulty in finding a provider.

Based on these findings, the CSE recommended A.M. be placed in the BOCES-CRC for the 2011-2012 school year. The IEP recommended that A.M. continue his 6:1+2 student/teacher ratio, and receive the following services: a 1:1 individual aide, speech/language therapy, occupational therapy, behavior intervention services, feeding therapy and parent training for A.M.'s parents. Pl. Ex. U, at 7-8. The IEP also contains 20 annual goals in the areas of basic concepts/classroom language, targeted skills, ADL Community, occupational therapy, speech/language and classroom foundation skills, with 45 related short-term objectives. Id., at 11-15.

The IEP notes that A.M. missed a "significant" number of school days. Further, it acknowledges A.M.'s parents' expressed dissatisfaction with BOCES-CRC as an appropriate placement, since they felt he still lacks chewing skills and is not eating enough to sustain him during the day. As a result, the Parents frequently took A.M. home after half a school day so he could eat. In light of this dissatisfaction, the District agreed to apply to other programs. Id., at 3.

By letter dated May 27, 2011, A.M.'s Parents requested that the District apply for A.M. to be placed at four specific schools. Def. Ex. 56. Applications were made, but A.M. was not accepted. Id. Although not on the list provided by the Parents, the District also applied for placement within the Levittown and Merrick school districts, which did accept him in September 2011. Def. Exs. 78 & 79: Acceptance letters.

In September 2011, A.M. started attending the Gersh Academy, as stated by his Parents in their letter to the District of May 4, 2011. Def. Ex. 62.

II. Administrative Review

In July 2011, A.M.'s parents requested an impartial hearing to find that the CSE failed to provide A.M. an appropriate education plan, that the Gersh Academy placement is appropriate, that the Parents have cooperated, and that they are entitled to reimbursement for tuition and transportation expenses for the 2011-2012 school year. Pl. Ex. A.

A hearing was held over the course of ten days, at which both parties were represented by counsel and presented evidence through witnesses and exhibits. See Certified Copy of Administrative Record. Plaintiffs offered 41 exhibits and the Defendant offered 82. On February 20, 2012, the Impartial Hearing Officer ("IHO") issued an 18-page decision that the District offered A.M. a "free appropriate public education" for the 2011-2012 school year as required by law, and thus, the Plaintiffs were not entitled to reimbursement of tuition and transportation expenses. See Decision of IHO of February 20, 2012 ("IHO Decision"). The IHO noted that the testimony presented indicated that A.M. had made "progress in all measurable educational areas" in the 2010-2011, which IEP provided a basis for the 2011-2012 year. Id., at 17.

By Notice of Petition and Verified Petition of March 26, 2012, the parents of A.M. appealed the IHO Decision to a New York State Education Department's State Review Officer ("SRO"). An SRO conducts a review of an IHO decision, examining the entire hearing record and to ensure that the procedures provided due process. Plaintiffs challenged the IHO Decision as being arbitrary and capricious, careless and thoughtless,

replete with errors, and based upon evidence fabricated by the District. Plaintiffs further claimed that the District failed to demonstrate that A.M. made meaningful progress at BOCES-CRC during the 2010-2011 school year. See Decision of SRO, dated April 30, 2012 ("SRO Decision"), at 10. The SRO issued a 20-page, single-spaced decision that outlined the facts and addressed the Parents' claims. Referencing the record, the SRO found there was no basis in the record to support the Parents' claim that the IHO was biased against them. Rather, the SRO found the IHO to be courteous, patient, and attentive "under sometimes challenging conditions." Id., at 13-14. The SRO also found there was no support in the record for the Parent's contention that the IHO improperly ignored or weighed the evidence, particularly the parents' demonstrative evidence of how the District's claim that A.M. ate 10 ounces of food was not possible.[5]

The SRO outlined A.M.'s progress during the 2010-2011 school year, and the creation of the IEP for the 2011-2012 school year at the May CSE meeting. Having taken an independent review of the record, the SRO agreed with the IHO's conclusion that the IEP was "reasonably calculated to enable [A.M.] to receive educational benefits," and that placement at BOCES-CRC "was an appropriate continuation of an educational program that provided the student with educational benefits, and thus, offered [A.M.] FAPE for the 2011-2012 school year." Id., at 16-17.

The SRO Decision also notes that the Parents did not seem to challenge the aspects of the IEP concerning A.M.'s progress in academic achievement, social development, physical development, management needs, the frequency or duration of

---

[5]This demonstration was the subject of Plaintiff's Exhibit OO, which, at the request of the Plaintiffs, was viewed by this Court at the hearing held on May 31, 2013.

speech and language therapy or occupational therapy, the full-time aide or the home-based program, and reviewed in detail the manner in which the IEP addressed these needs. Id., at 17-20.

Ultimately, the SRO concluded that the "evidence in the hearing record demonstrates that the district sustained its burden of offering [A.M.] a FAPE in the [least restrictive environment] for the 2011-12 school year." Having found the education plan offered was "appropriate," the SRO declined to reach the question of whether Gersh Academy was an appropriate placement, and whether the equities leaned in favor of the Parents. Id., at 20.

III. This Action

Plaintiffs' filed this action pursuant to the IDEA seeking *de novo* review and reversal of the SRO Decision, and a determination that Plaintiffs have met the legal standards to entitle them to reimbursement for A.M.'s enrollment in the Gersh Academy for the 2011-2012 school year. The parties have cross-moved for summary judgment.

At Plaintiffs' request, the Court held a hearing to permit Plaintiffs to show a video of the demonstration they conducted at the Impartial Hearing to show that the 15 spoonfuls of food the District claims A.M. was eating every day could not amount to 10 ounces as the District claimed. See Pl. Ex. OO. At that time, the Court also heard oral argument from counsel. Based on the entire record submitted, and for the reasons stated below, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

## DISCUSSION

I. <u>Legal Principles</u>

    A.   <u>Standards for Reimbursement under IDEA</u>

"The IDEA seeks to provide to all children with disabilities 'a free appropriate public education [FAPE] that emphasizes special education and related services.'" <u>C.L. v. Scarsdale Union Free School Dist.</u>, 2014 WL 928906, *1 (2d Cir. 2014), citing 20 U.S.C. § 1400(d)(1)(A) (other citations omitted). The FAPE must be specific to the unique needs of a particular child and reflect the IDEA's "'strong preference' for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment." <u>Id.</u>, citing <u>M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.</u>, 725 F.3d 131, 143 (2d Cir. 2013) and <u>Walczak v. Fla. Union Free Sch. Dist.</u>, 142 F.3d 119, 122 (2d Cir.1998).

"Where the state fails to provide a FAPE to a disabled child, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school education from the local education agency." <u>Id.</u>, citing 20 U.S.C. § 1412(a)(10)(C)(i), (ii) and <u>Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ.</u>, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

The Supreme Court has established the three-pronged <u>Burlington/Carter</u> test to determine when a parent is entitled to tuition reimbursement. The analysis examines (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities. <u>C.F. ex rel. R.F. v. New York City Dept. of Educ.</u>, 2014 WL 814884, *5 (2d Cir. 2014), citing <u>Frank G. v. Board of Educ. of Hyde</u>

Park, 459 F.3d 356, 363 (2d Cir. 2006); see also Burlington, 471 U.S. at 370 and Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 12–13, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

In New York, a parent seeking such reimbursement must first pursue that claim in a due process hearing before an IHO, and may appeal that decision to an SRO. Either party may then seek review of the SRO's decision in federal court, pursuant to 20 U.S.C. § 1415(i)(2)(A). C.L. v. Scarsdale Union Free School Dist., 2014 WL 928906, *2 (2d Cir. 2014).

B.  Standards of Review of SRO Decision

When reviewing an IDEA claim, a district court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." C.L. v. Scarsdale, at * 9, quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) and 20 U.S.C. § 1415(i)(2)(C)(iii).[6] However, this does not invite the courts to substitute their own notions of sound educational policy for those of the school authorities which they review, since "'[f]ederal courts 'lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" C.L. v. Scarsdale, at *9, quoting Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 206, 208 (1982). Thus, a district court must "accord deference" to the state agency

---

[6]20 U.S.C. § 1415(i)(2)(C) states that in an action to review a decision, the court shall (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

decision it reviews. Such deference though is not absolute, but "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012). See also C.F. ex rel. R.F. v. New York City Dept. of Educ., 2014 WL 814884, *5 (2d Cir. 2014) (the standard of review is more critical than "clear-error," but falls "well short of complete *de novo* review") (citations omitted). A well-reasoned decision of an SRO deserves deference as a "final administrative determination." K.L. ex rel. M.L. v. New York City Dept. of Educ., 530 Fed.Appx. 81, 85 (2d Cir. 2013). "The deference owed to an SRO's decision depends on the quality of that opinion." R.E. v. New York City Dept. of Educ., 694 F.3d 167, 189 (2d Cir. 2012).

II. Application

As an initial matter, the Court notes that the decision of the SRO is detailed, well-reasoned and persuasive, and entitled to the deference described in the Second Circuit decisions outlined above. Nevertheless, the Court has reviewed the administrative records and other materials presented, and undertakes its own review of whether the Plaintiffs are entitled to tuition reimbursement as permitted under the Burlington/Carter test.

A. The Burlington/Carter Test

As described above, that three-pronged test examines (1) whether the school district's proposed plan will provide the child with a free appropriate public education;

-15-

(2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities. C.F. ex rel. R.F. v. New York City Dept. of Educ., 2014 WL 814884, *5 (2d Cir. 2014) (citations omitted).

1. Did A.M.'s 2011-2012 IEP Offer FAPE?

The issue in this case is whether the IEP formulated at the May 26, 2011 CSE meeting offered A.M. a "free appropriate public education" in the "least restrictive environment." It must be noted that to be "appropriate" does not demand that the program be the most appropriate, or the best. "[F]ederal law 'does not secure the best education money can buy; it calls upon government, more modestly, to provide an *appropriate* education for each [disabled] child'". Walczak v. Florida Union Free School Dist., 142 F.3d 119, 130 (2d Cir. 1998), quoting Lunceford v. District of Columbia Bd. of Educ., 745 F.2d 1577, 1583 (D.C. Cir.1984) (Ruth Bader Ginsburg, J.)(emphasis in original).

The first prong of the Burlington/Carter test has two components to whether the plan offered is appropriate. First, the court will examine if there have been procedural violations, and if so, if they "impeded the child's right to a free appropriate public education," "impeded the parents' opportunity to participate," or "caused a deprivation of educational benefits." C.F. v. NYC Dept. of Education, 2014 WL 814884, *7 (2d Cir. 2014), quoting 20 U.S.C. § 1415(f)(3)(E)(ii). Secondly, the court will examine whether the IEP was "substantively adequate," meaning "'reasonably calculated to enable the child to receive educational benefits.'" C.F., at *7, quoting R.E., 694 F.3d at 190.

Plaintiffs' claim that the District's IEP was not "reasonably calculated to confer educational benefits to A.M." See Plaintiffs' Memorandum in Support of Plaintiffs'

Motion ("Pl. Mem."), at 16-20. The thrust of Plaintiffs' argument is that it is not possible that A.M. was eating 10 ounces of food a day at BOCES-CRC as the District claims, particularly in light of the testimony that typically 90% of his food came home uneaten, and the Parents' demonstration at the IHO hearing, as reflected on Ex. OO, reflects that claim is not possible. Plaintiffs argue that at best, A.M. ate "at most 3.7 ounces" of food, and that "when he does not eat, he becomes unstable and dysregulated and unavailable for learning." Id., at 16. Plaintiffs do not address or challenge the other needs or goals listed on A.M.'s IEP. Id., at 16-19.

Noting that the Plaintiffs challenge only the feeding issue and not the other areas of academic achievement and social and physical development addressed by the IEP, Defendant argues that according to various plans and progress reports, A.M. made progress in feeding, and that there was no need for A.M.'s mother to pick him up from school every day, since he has already eaten. For example, Phase 3 of the Feeding Intervention Plan initiated in October 2010, states that by May 11, 2011, A.M. was independently putting food in his mouth 88% of the time, and swallowing and remaining in his seat 100% of the time. Def. Ex. 64. The May 23, 2011 Speech and Language Progress Report of A.M.'s home feeding therapist notes that A.M. was "making progress in using proper bite and chew patterns, and that he appeared to be gaining weight." Def. Ex. 65. Whether A.M. consumed 3.7 or 10 ounces of food regularly, the IEP notes progress in this area, commenting that A.M. "appears comfortable during mealtimes," has increased his pace of eating, and joins his classmates around the table after finishing his lunch. Def. Ex. 69.

The Court finds it necessary to address Plaintiffs' continued claim that the food

demonstration evidence shown on Ex OO was ignored by the IHO and SRO. The Court finds there is no basis to find that evidence was ignored by either the IHO or the SRO. The SRO specifically addressed Plaintiffs' evidence that they claimed showed the District's claim of how much food A.M. ate was incorrect. See SRO Decision, at 12, 14. The SRO further noted that the IHO did not display any bias or prejudice against the Plaintiffs and provided them ample opportunities to be heard, and that there is no evidence in the record indicating that the Plaintiffs' evidence was ignored. Id., at 13-14. Similarly, having reviewed the record, this Court agrees with the SRO that there is no basis that the IHO or the SRO ignored any evidence or otherwise displayed bias or prejudice against either party. The parties were given ample opportunity to present evidence over the course of the 10 hearing days. Finally, Plaintiffs presented this demonstration to this Court at the hearing. See Pl. Ex. OO.

Based on a review of the record, the Court agrees with the SRO and IHO that the District's 2011-2012 IEP offered A.M. a free appropriate public education in the least restrictive environment. The IEP addressed not only A.M.'s feeding difficulties, but his need for speech and language therapy, occupational therapy, behavior intervention services and parent training. He reported progress in all of these areas while at BOCES-CRC in the 2010-2011 school year, and the Parents do not dispute that progress or the IEP's plan to continue to address A.M.'s other (non-feeding) needs in the 2011-2012 year. The Court notes that this progress occurred despite that A.M. was regularly pulled from school at 12 noon. A review of the record indicates that A.M. also showed progress with his feeding issues. While clearly the Parents were frustrated by the amount of food that BOCES-CRC reported A.M. was eating, the record indicates that by May 2011,

progress was being made, he appeared to be gaining weight, and that the IEP to continue that plan was appropriate. Thus, there is no need for the Court to address the other two prongs of the Burlington/Carter test, namely whether A.M.'s placement at the Gersh Academy was appropriate, or if the equities favored Plaintiffs. Therefore, Plaintiffs' motion for summary judgment is denied, and summary judgment is granted in favor of Defendants.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment is denied, and Defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this matter.

SO ORDERED.

s/ Leonard D. Wexler
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
March 31, 2014